ORIGINAL

IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE

2009 OCT 23  PM 3: 17

HOWARD G HOGAN

THOMAS GIRDLESTONE,
    Plaintiff,

v.                                Docket No.: *176327- 1*
                                  *Jury Demanded*

ACE LIMITED, a/k/a
ACE GROUP &
ACE WESTCHESTER,
d/b/a ILLINOIS UNION

    Defendants.

---

## SUMMONS

ATTEST:
Certified a True Copy
*Howard G Hogan*
Clerk and Master Chancery Court
By *Patti Bon*
            Deputy Clerk

TO:    ACE LIMITED, a/k/a
       ACE GROUP &
       ACE WESTCHESTER,
       d/b/a ILLINOIS UNION
       c/o Attorney Gregory W. Brown
       5410 Trinity Road, Suite 116
       Raleigh, North Carolina 27607
       PH: 919.719.0854

YOUR ARE HEREBY SUMMONED, and required to serve upon the Plaintiff's counsel, Russell L. Egli, Law Office of Russell L. Egli, 2575 Willow Point Way, Suite 111, Knoxville, TN 37931, an Answer to the Complaint served herewith upon you within thirty (30) days upon receipt of this Summons and accompanying Complaint exclusive of the day of service. If you fail to answer within the time required by law a default judgment may be taking upon you for the relief set forth in the Plaintiff's Complaint served upon you.

ISSUED, this   23   day of *October*, 2009.

*Howard G Hogan*
DEPUTY CLERK
*Patti Bon*

ADA
FOR ASSISTANCE CALL
865 215-2952
215-2497

EXHIBIT
A

## TO THE DEFENDANT:

Tennessee law provides a four thousand dollar ($4,000) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items of which you wish to exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law, and do not need to be listed, these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family bible, and school books. Should any of these items be seized you have the right to recover them. If you do not understand your exemption right or how to exercise it you may wish to seek the counsel of a lawyer.

MAIL LIST TO:     Knox County Chancery Court

**City-County Bldg. Suite 125**
**400 W. Main Street**
**Knoxville, TN 37902**

Please include docket number on list.

## **RETURN**

I hereby certify and return on the _____ day of _____, 2009 I served the foregoing Summons and Complaint on the person listed above by:

or I failed to serve the f_____

because



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete Item 4 If Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Gregory W. Brown, Esq.
5410 Trinity Road
Suite 116
Raleigh, NC. 27607

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
JAMES RAINFORD

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

OCT 26 REC'D

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)        7008 2810 0001 3236 0304

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

ORIGINAL

$184.50

FILED

# IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE

THOMAS GIRDLESTONE,

    Plaintiff,

*109.8991*
*969632*
*110243*

2009 OCT 23 PM 3:16

HOWARD G. HOGAN

v.

Docket No.: *176327- 1*

***JURY DEMANDED***

ACE LIMITED, a/k/a
ACE GROUP &
ACE WESTCHESTER,
d/b/a ILLINOIS UNION INSURANCE *110244*

    Defendants.

18
D
to
Atty

## COMPLAINT

    Comes the Plaintiff, Thomas Girdlestone, by and through under-signed counsel and for his Complaint against the Defendants, ACE Limited, a/k/a ACE Group and ACE Westchester Insurance Company, d/b/a Illinois Union Insurance Company would state to this Honorable Court as follows:

### I-PARTIES

    1.    Thomas Girdlestone (hereinafter "Girdlestone") is a resident and citizen of Knox County, Knoxville, Tennessee;

    2.    Defendants ACE Limited, also known as ACE Group and ACE Westchester, doing business as Illinois Union Insurance (hereinafter "ACE") upon information and belief has its principal place of business in New York City with satellite offices located in Illinois, Pennsylvania, Georgia, Texas, Colorado and California and is involved in the business of

1

wholesale distribution of excess and surplus lines property, casualty, environmental, professional liability and inland marine insurance products;

## II-VENUE

3.      Venue is proper before this Honorable Court as the Defendant's tortious conduct occurred in the State of Tennessee and Defendants, in the course of doing business in the State of Tennessee, have availed themselves of the laws of this State and submitted themselves to its jurisdiction. Further, this dispute arises out of a contractual relationship – a Directors and Officers Insurance Policy provided by ACE and the terms of that policy provide that Tennessee is the jurisdiction in which all disputes are to be resolved;

## III-FACTS GIVING RISE TO CAUSE OF ACTION

4.      ACE is not an admitted insurance provider in the State of Tennessee;

5.      Girdlestone has an established reputation as a successful businessman both in the United States and abroad;

6.      As a consequence of Girdlestone's reputation and business success he was asked, 2004, to serve as the CEO of Aurora Lighting, LLC; when Girdlestone was asked to serve as Aurora's CEO, Aurora was suffering from poor management, resulting in extreme losses for the company. At the time that Girdlestone was asked to serve as Aurora's CEO, he was also CEO of EmeraChem, a successful catalytic technology company located in Knoxville, Tennessee;

7.      Girdlestone accepted Aurora's offer to serves as its CEO. In his position as CEO, Girdlestone was covered by a Directors and Officers Insurance Policy ("D&O policy") provided by Defendant ACE through  Defendant Illinois Union Insurance (See attached Policy as Exhibit A);

2

8. The D&O policy provided for the defense of certain acts and omissions of Aurora's directors and officers, and among those covered acts was defamation;

9. In the course of his tenure as CEO at Aurora Girdlestone uncovered numerous instances of self-dealing and improper transactions by other Aurora officers and directors;

10. In retaliation for Girdlestone's efforts to root out these improper transactions, certain of the Aurora officers and directors conspired with Susan Elder (hereinafter "Elder") to fabricate a claim that Girdlestone had defamed her and also to terminate Girdlestone's employment. Indeed, certain of the evidence against Girdelstone consisted of canned statements that had been fabricated by Elder's lawyer and others and distributed to other purported "witnesses" to the alleged defamatory incident, who falsely attested to the truth of the fabricated affidavits;

11. ACE assumed the defense of Elder's frivolous claim against Girdlestone pursuant to the D&O policy and retained the services of Attorney William Sessions of Weintraub & Stock. When Sessions was retained, Girdlestone discussed with him the possibility of bringing a counter-claim against Elder and others who had conspired to bring the frivolous Elder action and to wrongfully terminate Girdlestone's employment. Sessions was receptive to the idea;

12. Girdlestone, innocent of the frivolous allegations brought against him, sought to vehemently defend the claim. As part of his response to the frivolous claim, Girdlestone sought to bring a counterclaim against those individuals who had conspired to bring the frivolous action against him and to terminate his employment;

13. ACE, which directed and authorized the nature and pursuit of Girdlestone's defense through its appointed counsel, however, refused to file a counter-claim on behalf of

3

Girdlestone, giving no attention to the strategic importance of including these counterclaims as a response to the frivolous allegations against him;

14.     That soon after ACE had retained the services of Sessions, he left the Weintraub firm. ACE then retained the services of Attorney Greg Grisham (hereinafter "Grisham") with the law firm of Leitner, Williams, Dooley & Napolitan;

15.     Unhappy with the services that Grisham was providing Girdlestone, Girdlestone contacted Rodriquez to complain about the lack of attention his legal defense was providing him. ACE continued to regulate and assume authority to direct the line of Girdlestone's defense in the Elder case. Rodriquez became angry with Girdlestone for seeking to protect his rights, and told him that he was overreacting and taking the lawsuit too personally. Notwithstanding the frivolity of the Elder allegations and the improper actions that had been taken against Girdlestone, Rodgriguez told him he should just settle the case. When Girdlestone informed Rodriquez that given his business and reputational interests, he thought it important to defend his innocence, Rodriquez became angrier still. Further, upon information and belief Rodriquez is a licensed attorney with the right to practice law in New York;

16.     Girdlestone informed Rodriquez that he was not going to settle, that the claim was frivolous, that there had been a conspiracy to bring the action against him and that he wanted to protect his reputation by defending against the lawsuit and bringing counterclaims against the appropriate individuals;

17.     Rodriquez, however, failed to authorize the taking of any action to investigate a counter-claim for Girdlestone;

4

18.     Because ACE has demonstrated no interest in protecting Girdlestone's interests by vigorously defending against the frivolous Elder allegations, Girdelstone was forced to retain the services of Attorney Russell L. Egli and Tanya Acker;

19.     Girdlestone then brought a counter-claim against Elder and a third-party claim against Tom Rose, Anthony Willis and David Shields, all board members of Aurora and thus covered under the same D&O policy issued by ACE. Girdlestone's claims involved counts of civil conspiracy, malicious prosecution, as well as infliction of emotional distress;

20.     After filing the counter-claim and third-party claim, Girdlestone instructed Egli to inform Rodriquez of the fact that there existed a serious conflict of interest with respect to ACE's handling of the Elder claims and Girdlestone's counterclaims. Indeed, Rodriquez was his claims adjuster on the Elder claim and also the claims adjuster on the claim Girdlestone had brought against the other officers and directors of Aurora. Rodriquez was thus in the position of defending Girdlestone in one instance and attempt to defeat him in another;

21.     Neither Rodriquez nor any one else at ACE ever responded to Girdlestone's letter, nor did Rodriquez or anyone else at ACE call Girdlestone to discuss the conflict of interest issue he had raised;

22.     On or about October of 2008 Girdlestone dismissed his lawsuit against Aurora officers and directors Rose, David Shields and Anthony Willis, on procedural grounds, but re-filed it under the savings statute;

23.     On or about October of 2008, Girdlestone discovered that there existed evidence that, if pursued, would have provided additional bases of support for certain of the affirmative defenses he was asserting in the Elder action;

5

24.     ACE only belatedly authorized the investigation and pursuit of that evidence, waiting so long to do so that there was not sufficient time to develop it in advance of trial;

25.     Girdlestone also pressured ACE to authorize the taking of the deposition of Coleman Bryan, a former board member of Aurora who had knowledge of the frivoloity of Elder's claims and of the improper circumstances surrounding Girdlestone's termination. Bryan was in poor health, a point about which Girdlestone continued to advise Grisham and ACE. ACE refused to authorize the deposition and continued to insist that no more depositions were necessary. Instead of doing any further necessary investigation of the case, ACE insisted that Girdlestone concede to mediation before continuing to pursue and investigate critical lines of defense. Bryan is now deceased and his deposition never was taken;

26.     Rodriquez began threatening Girdlestone, informing him that if he did not enter mediation with Elder she would pull his legal defense;

27.     Rodriquez also threatened Girdlestone that if he did not cooperate in settling the Elder claim she would pull his defense, thus indicating that she intended to improperly invoke a "hammer" provision notwithstanding the fact that there was no provision in the policy permitting this tactic;

28.     Girdlestone agreed to mediate the Elder claim only if the mediation was a "global mediation" which would discuss and possibly settle all claims and counterclaims at issue Exhibit B;

29.     Initially ACE agreed to do a global mediation but then reneged on this agreement. Rodriquez again threatened Girdlestone that unless he mediated she would pull his legal defense;

6

30.     Girdlestone again demanded that Rodriquez and ACE enter into a "global mediation." Rodriquez and ACE finally agreed to a global mediation, which agreement was reflected in the agreement to mediate;

31.     During the mediation Rodriquez and ACE again reneged on their agreement to move forward with a global mediation, and again threatened Girdlestone that, if he did not settle the Elder action during that mediation, she would cancel his ACE-appointed defense. Rodriquez insisted that Girdlestone settle the Elder claims – and release Elder and her lawyers from Girdlestone's claims arising from their role in the conspiracy against him – without providing Girdlestone any opportunity to seek a meaningful resolution of his claims and counterclaims. Rodriquez then called Mr. Girdlestone a "fucker;" in the presence of Egli and Acker and refused to allow Girdlestone the opportunity to develop evidence critical to his defense;

32.     Girdlestone agreed to settle the matter only if ACE would execute an acknowledgement that he was not settling the Elder matter willingly but was in fact being forced to do so by ACE (See attached Acknowledgement as Exhibit C);

33.     As Rodriquez agreed to sign the acknowledgement if Girdlestone would agree to settle the claim, Girdlestone conditioned his assent to the settlement on Rodriquez's execution of the acknowledgment. Girdlestone faxed to Rodriquez the acknowledgement and signed the settlement agreement – his assent being expressly conditioned on Rodriquez's compliance with their agreement that she sign the acknowledgement provided by Girdlestone. After receiving Girdlestone's signature, however, Rodriquez refused to sign the acknowledgment;

34.     After this fraudulent inducement to settle the Elder matter, Rodriquez made only a bad faith offer to settle Girdlestone's claims, which he rejected. Rodriquez then left her office, effectively terminating the mediation;

7

35.     Since the fraudulently-induced mediation Girdlestone's counsel made a demand to ACE to settle Girdlestone's claims against ACE and discovered that Rodriquez was no longer working at ACE;

36.     Despite Girdlestone demanding that ACE mediate this claim pursuant to the D&O Policy, ACE refused to do so;

37.     Girdlestone subsequently demanded from ACE-retained counsel Grisham a copy of his "claims file," which Grisham initially refused to produce. Further, ACE-appointed counsel Grisham wrote Egli back and threatened to withdraw as Girdlestone's counsel if he did not sign the order of dismissal on the Elder claim;

38.     Girdlestone then made a written demand to ACE pursuant to the D&O policy that it appear for non-binding mediation to try and settle Girdlestone's claims;

39.     ACE agreed to comply with the D&O policy and mediate the Girdlestone claims; that mediation was to be held on October 8, 2009 before the Honorable Robert Murrian in Knoxville, Tennessee;

40.     Two days prior to mediation, however, ACE cancelled the agreed upon mediation.

<u>IV-UNFAIR CLAIMS PRACTICE-COUNT 1</u>

41.     Girdlestone incorporates by reference paragraphs 1-40 above as inclusive of paragraph 41 of Count 1;

42.     Defendants acts and omissions herein constitute are in violation of T.C.A. § 56-8-103 (Unfair Methods of Competition and Unfair or Deceptive Acts Prohibited);

43.     More specifically, Defendants acts and omissions herein are in violation of T.C.A. § 56-8-105 (Unfair Claims Practice) paragraph (1)-(4);

8

## V-NEGLIGENCE-COUNT 2

44.     Girdlestone incorporates by reference paragraphs 1-40 above as inclusive of paragraph 44 of Count 2;

45.     As an insured Defendants owed Girdlestone a fiduciary duty;

46.     As an insured Defendants owed Girdlestone a duty of care not to damage his reputation or cause him to suffer future economic damage;

47.     The failure of Defendants to protect the interests of Girdlestone over that of their own interests has caused Girdlestone damages.

## VI-VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT-COUNT 3

48.     Girdlestone incorporates by reference paragraphs 1-40 above as inclusive of paragraph 48 of Count 3:

49.     That by deceiving and misleading Girdlestone Defendants have violated the Tennessee Consumer Protection Act and have caused Girdlestone damages and attorney fees;

## VII-BREACH OF CONTRACT-COUNT 4

50.     Girdlestone incorporates by reference paragraphs 1-40 above as inclusive of paragraph 50 of Count 4:

51.     That Girdlestone was a third-party beneficiary to the contractual obligation between Aurora Lighting and Defendants in his position as CEO of Aurora;

52.     That as a third-party beneficiary to the D&O contract between Aurora and the Defendants, Defendants owed a duty to properly investigate evidence in the Elder matter which would have provided Girdlestone an affirmative defense and or ultimately a dismissal of Elder's claim;

9

53.     That by not sufficiently investigating important evidence which would have provided a defense or exculpated Girdlestone with regard to Elder's claims Defendants breached the contract with Girdlestone as a third-party beneficiary and caused him damages as a result thereof;

## VII-OUTRAGEOUS CONDUCT-COUNT 5

54.     Girdlestone incorporates by reference paragraphs 1-40 above as inclusive of paragraph 54 of Count 5:

55.     That as an insured Defendants owed a duty of undivided loyalty to Girdlestone;

56.     That Defendants willfully and maliciously disregarded their loyalty to Girdlestone by using threats, intimidation tactics and misrepresentations of the policy provisions to force Girdlestone to settle the Elder claim;

57.     That Defendants' conduct towards its insured is further outrageous in that Defendants' referred to Girdlestone as a "fucker" during the Elder mediation;

## VIII-FRAUDULENT MISREPRESENTATION-COUNT 6

58.     Girdlestone incorporates by reference paragraphs 1-40 above as inclusive of paragraph 58 of Count 6;

59.     Defendants had no intention to conduct a global mediation of the Elder claim, as well as Girdlestone's claims when it represented to Girdlestone it would;

60.     Girdlestone relied upon Defendants' fraudulent misrepresentations to his detriment;

61.     Defendants fraudulently misrepresented the provisions of the D&O policy and the authority that Defendants had under the policy;

10

62. That by relying on the fraudulent misrepresentations by Defendants Girdlestone suffered damages;

WHEREFORE, PREMISES CONSIDERED PLAINTIFF PRAYS FOR JUDGMENT AS FOLLOWS:

A. That the Defendants be served with process and that they be required to answer this complaint under oath within the time required by law. That by agreement Attorney Gregory W. Brown accepts service on behalf of the Defendants;

B. For a jury to try this cause;

C. For an award of damages as to Count 1 in maximum statutory amount;

D. For an award of damages as to Count 2 of not less than $500,000;

E. For an award of damages as to Count 3 of not less than $2,000,000 trebled for a demand of $6,000,000;

F. For an award of damages as to Count 4 of not less than $$100,000;

G. For an award of damages as to Count 5 of not less than $1,000,000;

H. For an award of damages as to Count 6 of not less than $100,000;

I. For an award of punitive damages to be determined separately by the jury;

J. For an award of attorney fees pursuant to Count 3 of this complaint;

K. For an award of discretionary costs;

L. For costs of this cause to be taxed to Defendants;

M. For general relief.

11

Respectfully submitted,

LAW OFFICE OF RUSSELL L. EGLI

Russell L. Egli
Attorney for the Plaintiff
P.O. Box 23843
Knoxville, TN 37933
(865) 531-8192
BPR#024408

## COST BOND

We, the under-signed authorities bind ourselves as principal and surety respectively.

Thomas Girdlestone

Russell L. Egli, Esq.

12

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>Aurora Lighting, Inc. | | | Endorsement Number<br>3 |
|---|---|---|---|
| Policy Symbol<br>BMI | Policy Number<br>20025651 | Policy Period<br>September 25, 2005  to  September 25, 2006 | Effective<br>September 25, 2005 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

## SERVICE OF SUIT ENDORSEMENT

Information about service of "suits" upon us is given below. Service of process of "suits" against us may be made upon the following person, or another person we may designate:

> Saverio Rocca, Assistant General
> Counsel
> ACE USA Companies
> Two Liberty Place – TL35M
> 1601 Chestnut Street
> Philadelphia, PA 19103

The person named above is authorized and directed to accept service of process on our behalf in any action, "suit" or proceeding instituted against us. If you request, we will give you a written promise that a general appearance will be entered on our behalf if a "suit" is brought.

If you request, we will submit to the jurisdiction of any court of competent jurisdiction. We will accept the final decision of that court or any Appellate Court in the event of an appeal.

The law of some jurisdictions of the United States of America require that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as our agent for service of process. In these jurisdictions, we designate the Director of Insurance as our true and lawful attorney upon whom service of process on our behalf may be made. We also authorize the Director of Insurance to mail process received on our behalf to the company person named above.

If you are a resident of Canada, you may also serve "suit" upon us by serving the government official designated by the law of your province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

XS-1U96d (03/2002)

EXHIBIT A

 Illinois Union Insurance Company

**Business and Management
Indemnity Policy**

Declarations

This Policy is issued by the stock insurance company listed above ("Insurer").

THE EMPLOYMENT PRACTICES, DIRECTORS & OFFICERS AND COMPANY, FIDUCIARY, TECHNOLOGY, MEDIA AND PROFESSIONAL SERVICES AND MISCELLANEOUS PROFESSIONAL SERVICES COVERAGE SECTIONS OF THIS POLICY, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS DISCOVERED DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES UNLESS OTHERWISE PROVIDED HEREIN. AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AND DEDUCTIBLE AMOUNTS.

TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO THE APPROPRIATE DEFINITIONS SECTIONS OF THIS POLICY.

Policy Number: BMI20025651

Item A. Parent Company: Aurora Lighting, Inc.
Principal Address: 8870 Cedar Springs Lane
Knoxville, TN 37923

Item B. Policy Period:    From: September 25, 2005    To: September 25, 2006
12:01 a.m. local time at the Principal Address shown in Item A.

Item C. Coverage Section(s):

    DIRECTORS & OFFICERS AND COMPANY

      1.  Limit of Liability
         a.  $ 2,000,000 aggregate for all Loss, subject to 1b and 1c immediately below,
         b.  $ 0 additional aggregate for all Loss under Insuring Clause A1, subject to 1c immediately below,
         c.  $ 2,000,000 maximum aggregate for this Coverage Section

      2.  Retentions:
         $ 0      each Claim under Insuring Clause 1
         $ 5,000 each Claim under Insuring Clause 2
         $ 5,000 each Claim under Insuring Clause 3

      3.  Continuity Date:  September 25, 2003 for any loss payable as respects the first
                    $1,000,000 of the above limit of liability
                    September 25, 2005 for any loss payable as respects the above limit
                    of liability in excess of $1,000,000

Case 3:09-cv-00530-TWP-CCS   Document 1-1   Filed 12/04/09   Page 16 of 43   PageID #: 20

Item D. Premium: $9,037

Item E. Discovery Period

| | |
|---|---|
| 1. One (1) year | 100% of the premium |
| 2. Two (2) years | 125% of the premium |
| 3. Three (3) years | 150% of the premium |

As provided in subsection H of the General Terms and Conditions, only one of the above **Discovery Period** options may be elected and purchased.

Item F. **Run-Off Period**

| | |
|---|---|
| 1. One (1) year | 100% of the premium |
| 2. Two (2) years | 115% of the premium |
| 3. Three (3) years | 130% of the premium |
| 4. Four (4) years | 140% of the premium |
| 5. Five (5) years | 145% of the premium |
| 6. Six (6) years | 150% of the premium |

As provided in subsection I of the General Terms and Conditions, only one of the above **Run-Off Period** options may be elected and purchased.

Item G. Notice under this **Policy** shall be given to:

ACE Westchester Specialty Claims
1133 Avenue of the Americas
38th Floor
New York, NY 10036

Item H. Forms attached at **Policy** issuance: TRIA, SL-15191 07/05, SL-15193 07/05, SL-15319, SL-15324,
XS-1U96d.

IN WITNESS WHEREOF, the **Insurer** has caused this **Policy** to be signed by its President and Secretary, and countersigned by a duly authorized representative of the **Insurer**.

GEORGE R. MULLIGAN, Secretary

JOHN J. LUPICA, President

DATE: 11|3|05

Authorized Representative

TENNESSEE

## NOTICE TO INSURED:

This insurance contract is with an insurer not licensed to transact insurance in this state
and is issued and delivered as a surplus lines coverage pursuant to the Tennessee insurance
statutes.

SL TN 2004



**Business and Management
Indemnity Policy**

General Terms and Conditions

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows:

**A.  SEVERABILITY OF GENERAL TERMS AND CONDITIONS**

These General Terms and Conditions apply to each and every Coverage Section of this **Policy**. The terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

**B.  DEFINITIONS**

Whenever used in this **Policy**, the terms that appear below in **boldface** type shall have the meanings set forth in this Definitions subsection of the General Terms and Conditions. However, if a term also appears in **boldface** type in a particular Coverage Section and is defined in that Coverage Section, that definition shall apply for purposes of that particular Coverage Section. Terms that appear in **boldface** in the General Terms and Conditions but are not defined in this Definitions subsection and are defined in other Coverage Sections of the **Policy** shall have the meanings ascribed to them in those Coverage Sections.

1.  **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a renewal or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

2.  **Company** means:
    a)  the **Parent Company**; and

    b)  any **Subsidiary**,

    and includes any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

3.  **Discovery Period** means one of the periods described in Item E of the Declarations which is elected and purchased pursuant to subsection H below.

4.  **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

5.  **Extended Period** means the **Discovery Period** or the **Run-Off Period**, if such provision is elected and purchased pursuant to subsections H or I, respectively, below.

6.  **Insurer** means the insurance company providing this insurance.

7.  **Parent Company** means the entity first named in Item A of the Declarations.

8.  **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.

9. **Policy Period** means the period from the effective date and hour of the inception of this **Policy** to the **Policy** expiration date and hour as set forth in Item B of the Declarations, or its earlier cancellation date and hour, if any.

10. **Run-Off Period** means one of the periods described in Item F of the Declarations, which is elected and purchased pursuant to subsection I below.

11. **Subsidiary** means:

    a) any entity of which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company**, directly or indirectly, if such entity:

        (i) was so owned on or prior to the inception date of this **Policy** ; or

        (ii) becomes so owned after the inception date of this **Policy**; and

    b) any joint venture entity in which the **Parent Company**, or an entity described in a) above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Company** or entity described in a) above solely controls the management and operations of such joint venture entity.

12. **Takeover** means:

    a) the acquisition by any person or entity of more than 50% of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

    b) the merger or consolidation of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

All definitions shall apply equally to the singular and plural forms of the respective words.

## C. LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES

1. The Limits of Liability, Retentions and Deductibles for each Coverage Section are separate Limits of Liability, Retentions and Deductibles pertaining only to the Coverage Section for which they are shown. The application of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

2. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. The largest applicable Retention or Deductible shall apply only once to such **Claim**.

## D. WARRANTY

It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy**, the **Insureds** agree that:

1. the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

2. In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall be void ab initio with respect to any **Insureds** who had knowledge of such misrepresentation or omission.

### E.  CANCELLATION

1. By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Company** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Company** may cancel this **Policy** in its entirety or any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

2. This **Policy** may be cancelled by the **Insurer** only for nonpayment of premium, by mailing written notice to the **Parent Company** stating when such cancellation shall be effective, such date to be not less than ten (10) days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

3. If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

### F.  ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of natural persons who are **Insureds** shall be considered **Insureds** under this **Policy**; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the natural person who is an **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retentions and Deductibles applicable to **Loss** incurred by natural persons who are **Insureds** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

### G.  AUTHORIZATION CLAUSE

By acceptance of this **Policy**, the **Parent Company** agrees to act on behalf of all **Insureds**, and the **Insureds** agree that the **Parent Company** will act on their behalf, with respect to the giving of all notices to **Insurer**, the receiving of notices from **Insurer**, the agreement to and acceptance of endorsements, the payment of the premium and the receipt of any return premium.

### H.  DISCOVERY PERIOD

1. If this **Policy** or any Coverage Section is cancelled or is not renewed by the **Insurer**, for reasons other than non-payment of premium or if the **Parent Company** elects to cancel or not to renew this **Policy** or a Coverage Section, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item E of the Declarations of the total premium for this **Policy**, or the total premium for the cancelled or not renewed Coverage

Section, whichever is applicable, to purchase an extension of the coverage granted by this **Policy** or the applicable cancelled or not renewed Coverage Section with respect to any **Claim** first made during the period of time set forth in Item E of the Declarations after the effective date of such cancellation or, in the event of a refusal to renew, after the **Policy** expiration date, but only with respect to any **Wrongful Act** committed before such date. The **Parent Company** shall have the right to elect only one of the **Discovery Periods** set forth in Item E of the Declarations.

2.  As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H1 above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

3.  In the event of the purchase of the **Discovery Period**, the entire premium therefore shall be deemed earned at the commencement of the **Discovery Period**.

4.  The exercise of the **Discovery Period** shall not in any way increase or reinstate the limit of **Insurer's** liability under any Coverage Section.

## I.  RUN-OFF COVERAGE

In the event of a Takeover:

1.  The **Parent Company** shall have the right, upon payment of an additional premium calculated at the percentage of the total premium for this **Policy** set forth in Item F of the Declarations, to an extension of the coverage granted by this **Policy** with respect to any **Claim** first made during the **Run-Off Period**, as set forth in Item F of the Declarations, but only with respect to any **Wrongful Act** committed before the effective date of the **Takeover** (herein defined as "Run-Off Coverage"); provided, however, such additional premium shall be reduced by the amount of the unearned premium from the date of the **Takeover** or the date of notice of the election of the Run-Off Coverage, whichever is later, through the expiration date set forth in Item B of the Declarations.

2.  The **Parent Company** shall have the right to elect only one of the periods designated in Item F of the Declarations. The election must be made prior to the expiration of the **Policy Period**. The right to purchase a **Run-Off Period** shall terminate on the expiration of the **Policy Period**.

3.  If a **Run-off Period** is elected and purchased:

    a)  Subsection E, above, is deleted in its entirety and neither the **Insureds** nor the **Insurer** may cancel this **Policy** or any Coverage Section thereof;

    b)  Subsection H, above, is deleted in its entirety; and

    c)  the maximum aggregate Limit of Liability of the **Insurer** for each Coverage Section purchased and set forth on the Declarations shall be twice the otherwise applicable maximum aggregate Limit of Liability set forth in Item C of the Declarations for such Coverage Section; provided, however, the maximum aggregate Limit of Liability of the **Insurer** in connection with any one **Claim** shall be amount originally shown as the maximum aggregate Limit of Liability for each Coverage Section purchased and set forth on the Declaration.

## J.  ALTERNATIVE DISPUTE RESOLUTION

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this subsection.

Either an Insured or the Insurer may elect the type of ADR process discussed below; provided, however, that the Insured shall have the right to reject the choice by the Insurer of the type of ADR process at any time prior to its commencement, in which case the choice by the Insured of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which the Insurer and the Insured mutually agree, in which the Insured and the Insurer shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) arbitration submitted to any arbitration facility to which the Insured and the Insurer mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, and insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence arbitration in accordance with this section; provided, however, that no such arbitration shall be commenced until at least 60 days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item A of the Declarations as the principal address of the Parent Company. The Parent Company shall act on behalf of each and every Insured in connection with any ADR process under this section.

## K. TERRITORY

Coverage under this Policy shall extend to Wrongful Acts taking place or Claims made anywhere in the world.

## L. ASSISTANCE, COOPERATION AND SUBROGATION

The Insureds agree to provide Insurer with such information, assistance and cooperation as Insurer reasonably may request, and they further agree that they shall not take any action which in any way increases Insurer's exposure under this Policy. In the event of any payments under this Policy, Insurer shall be subrogated to the extent of such payment to all of the Insureds' rights of recovery against any person or entity. The Insureds shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable Insurer effectively to bring suit or otherwise pursue subrogation in the name of the Insureds, and shall provide all other assistance and cooperation which Insurer may reasonably require.

## M. ACTION AGAINST INSURER, ALTERATION AND ASSIGNMENT

Except as provided in subsection J above, Alternative Dispute Resolution, no action shall lie against Insurer unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this Policy. No person or organization shall have any right under this Policy to join Insurer as a party to any action against the Insureds to determine their liability, nor shall Insurer be impleaded by the Insureds or their legal representative. No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by an authorized representative of the Insurer.

## N. ENTIRE AGREEMENT

By acceptance of this Policy, the Insureds agree that this Policy embodies all agreements existing between them and Insurer or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Insurer shall not effect a waiver or a change in any part of this Policy or estop Insurer from asserting any right under the terms of this Policy or otherwise, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by Insurer to form part of this Policy.



**Business and Management
Indemnity Policy**

Directors & Officers and Company
Coverage Section

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

## A. INSURING CLAUSES

1. The **Insurer** shall pay the **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

2. The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

3. The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim** first made against the **Company** during the **Policy Period** or, if applicable, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

## B. DEFINITIONS

1. **Claim** means:

   a) a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

   b) a written demand by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**;

   c) a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

   d) a criminal proceeding against any **Insured**, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   e) an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief; or

   f) a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document.

2. **Continuity Date** means the date set forth in Item C of the Declarations relating to this Coverage Section.

3. **Costs, Charges and Expenses** means:

   a) reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds

arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability; and

b)   reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company**, to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**.

**Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company**.

4.   **Directors and Officers** means any person who was, now is, or shall become:

a)   a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**;

b)   a person who was, is or shall become a full-time or part-time employee of the **Company**; and

c)   the functional equivalent of directors or officers of a **Company** incorporated or domiciled outside the United States of America.

5.   **Insureds** mean the **Company** and the **Directors and Officers**.

6.   **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

7.   **Loss** means damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Directors and Officers** under Insuring Clauses 1 or 2, or the **Company** under Insuring Clause 3. **Loss** does not include:

a)   taxes, fines or penalties;

b)   matters uninsurable under the laws pursuant to which this **Policy** is construed;

c)   punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

d)   the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

e)   any amount for which the **Insured** is not financially liable or legally obligated to pay;

f)   the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; or

g)   any amounts owed or paid to one or more securities holders of the **Company** under any written or express contract or agreement.

8.   **Outside Entity** means:

a)   any non-profit company which is exempt from taxation under the Internal Revenue Code, as amended, in which any of the **Directors and Officers** is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

b)   any other company specifically identified by endorsement to this **Policy**.

9. **Wrongful Act** means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

   a) any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity;

   b) any of the **Directors and Officers**, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

   c) the **Company**, but only with respect to Insuring Clause 3 of this Coverage Section.

## C. EXCLUSIONS

1. **Exclusions Applicable to All Insuring Clauses**

   **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

   a) for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

   b) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

      (i) any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

      (ii) any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

   c) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

      (i) the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

      (ii) any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so; provided, however, this exclusion shall not apply to any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

      For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed).  **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

   d) for any actual or alleged violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

e) brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, any **Outside Entity** or any person or entity that is an owner of or joint venture participant in any **Subsidiary** in any respect and whether or not collusive, unless such **Claim**:

  (i) is brought derivatively by a securities holder of the **Parent Company** and is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation of, or intervention of, any **Insured**;

  (ii) is brought or maintained by any **Insured** in the form of a cross claim, third party claim or other proceeding for contribution or indemnity which is part of, and directly results from a **Claim** that is covered by this Coverage Section;

  (iii) is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**;

  (iv) is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**; or

  (v) is brought or maintained by any bankruptcy trustee or bankruptcy appointed representative of the **Company**;

f) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

  (i) any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f)(i) shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

  (ii) the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled; provided, however this exclusion f)(ii) shall not apply unless and until there is a final judgment against such **Directors and Officers** as to such conduct.

When f) (i) or (ii) apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges or Expenses**;

g) for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company** or **Outside Entity**, which payment without such previous approval shall be held to be in violation of law;

h) against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Directors and Officers** thereof:

  (i) before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

  (ii) occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**;

i) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

j) for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**; provided, however, that this exclusion shall not apply to **Loss** resulting from any such **Claim** to the extent that:

   (i) such **Claim** is based on the service of any of the **Directors and Officers** as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

   (ii) such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**; and

   (iii) such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

k) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   (i) any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

   (ii) any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

l) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

m) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment–related matters brought by or on behalf of or on the right of an applicant for employment with the **Company**, or any of the **Directors and Officers**, including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Company**;

n) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   (i) any initial public offering of securities undertaken and consummated by the **Company**, including all activities in connection therewith;

   (ii) the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto in connection with any **Wrongful Act** actually or allegedly committed subsequent to the consummation of an initial public offering of securities of the **Company**; or

   (iii) any equity or debt offering, solicitation, sale, distribution or issuance of securities of the **Company** in excess of $50 million where such issuance takes place during the **Policy Period** and is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3(b) of the Securities Act of 1933 and rules and regulations promulgated thereunder, or any activities or transactions dealing in any way with such issuance of securities of the **Company**; provided, however, this exclusion shall not apply if the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in

connection with such issuance of securities and the **Insureds** have paid the premium required by the **Insurer** for such coverage extension; or

o) for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

2. Exclusions Applicable Only to Insuring Clause A3

**Insurer** shall not be liable for **Loss** on account of any **Claim**:

a) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the **Company** would have been liable in the absence of such contract or agreement; or

b) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   (i) any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trademarks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services; or

   (ii) any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Company**.

Provided, however, the exclusions in 2a) and 2b) above shall not apply to any such **Claim** brought or maintained, directly or indirectly, by one or more securities holders of the **Company** in their capacity as such.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D. **LIMIT OF LIABILITY AND RETENTIONS**

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amounts applicable to this Coverage Section, as shown in Item C of the Declarations. Such Retentions shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item C1 of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

a) The amount set forth in Item C1a relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section, subject to additional payments for **Loss** under Insuring Clause A1 as further described in subsection b) immediately below.

b) The amount set forth in Item C1b relating to this Coverage Section shall be an aggregate limit of liability for the payment of **Loss** under Insuring Clause A1 in addition to the limit described in subsection a) immediately above; provided, all payments for **Loss** under the additional limits described in this subsection b) shall be excess of the limit described in subsection a) above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b).

c) The amount set forth in Item C1c of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section. The limit of liability set forth in C1a and C1b relating to

this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item C1c for this Coverage Section.

3. All Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the Policy Period:

   a) the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made; or

   b) the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to subsection E2, below.

4. The Retention applicable to Insuring Clause 2 shall apply to Loss resulting from any Claim if indemnification for the Claim by the Company is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the Company is made, except and to the extent such indemnification is not made by the Company solely by reason of the Company's financial insolvency.

5. Payments of Loss by Insurer shall reduce the Limit(s) of Liability under this Coverage Section. Costs, Charges and Expenses are part of, and not in addition to, the Limits of Liability and payment of Costs, Charges and Expenses reduce the Limits of Liability. If such Limit(s) of Liability are exhausted by payment of Loss, the obligations of the Insurer under this Coverage Section are completely fulfilled and extinguished.

## E. NOTIFICATION

1. The Insureds shall, as a condition precedent to their rights to payment under this Coverage Section only, give Insurer written notice of any Claim as soon as practicable, but in no event later than sixty (60) days after the end of the Policy Period. If any Claim is first made against the Insureds during the Extended Period, if purchased, written notice to Insurer must be given as soon as practicable, but in no event later than sixty (60) days after the end of the Extended Period.

2. If, during the Policy Period or the Discovery Period, if purchased, any of the Insureds first becomes aware of a specific Wrongful Act which may reasonably give rise to a future Claim covered under this Policy, and if the Insureds, during the Policy Period or the Discovery Period, if purchased, give written notice to Insurer as soon as practicable of:

   a) a description of the Wrongful Act allegations anticipated;

   b) the identity of the potential claimants;

   c) the circumstances by which the Insureds first became aware of the Wrongful Act;

   d) the identity of the Insureds allegedly involved;

   e) the consequences which have resulted or may result; and

   f) the nature of the potential monetary damages and non-monetary relief;

   then any Claim made subsequently arising out of such Wrongful Act shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the Insurer. No coverage is provided for fees, expenses and other costs incurred prior to the time such Wrongful Act results in a Claim.

3. Notice to Insurer shall be given to the address shown under Item G of the Declarations for this Policy.

## F. SETTLEMENT AND DEFENSE

1. It shall be the duty of the Insurer and not the duty of the Insureds to defend any Claim. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The Insurer's duty to defend any Claim shall cease when the Limits of Liability have been exhausted by the payment of Loss including Costs, Charges and Expenses.

2. The Insurer may make any investigation it deems necessary, and shall have the right to settle any Claim; provided, however, no settlement shall be made without the consent of the Parent Company, such consent not to be unreasonably withheld.

3. The Insureds agree not to settle or offer to settle any Claim, incur any Costs, Charges and Expenses or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any settlement, Costs, Charges and Expenses, assumed obligation or admission to which it has not consented. The Insureds shall promptly send to the Insurer all settlement demands or offers received by any Insured from the claimant(s).

4. The Insureds agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agree that, in the event of a Claim, the Insureds will do nothing that shall prejudice the position of the Insurer or its potential or actual rights of recovery.

## G. OTHER INSURANCE

If any Loss covered under this Coverage Section is covered under any other valid and collectible insurance, then this Policy shall cover the Loss, subject to its terms and conditions, only to the extent that the amount of the Loss is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

## H. PAYMENT PRIORITY

1. If the amount of any Loss which is otherwise due and owing by the Insurer exceeds the then-remaining Limit of Liability applicable to the Loss, the Insurer shall pay the Loss, subject to such Limit of Liability, in the following priority:

   a) first, the Insurer shall pay any Loss covered under Insuring Clause A1, in excess of any applicable Retention shown in Item C of the Declarations; and

   b) second, only if and to the extent the payment under subsection 1 above does not exhaust the applicable Limit of Liability, the Insurer shall pay any Loss in excess of the Retention shown in Item C of the Declarations covered under any other applicable Insuring Clause.

   c) Subject to the foregoing subsection, the Insurer shall, upon receipt of a written request from the Chief Executive Officer of the Parent Company, delay any payment of Loss otherwise due and owing to or on behalf of the Company until such time as the Chief Executive Officer of the Parent Company designates, provided the liability of the Insurer with respect to any such delayed Loss payment shall not be increased, and shall not include any interest, on account of such delay.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>Aurora Lighting, Inc. | | | Endorsement Number<br>1 |
|---|---|---|---|
| Policy Symbol<br>BMI | Policy Number<br>20025651 | Policy Period<br>September 25, 2005 to September 25, 2006 | Effective<br>September 25, 2005 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

### NON-ENTITY EMPLOYMENT PRACTICES

It is agreed that the Directors & Officers and Company Coverage Section is amended as follows:

1. Section B, Definitions, is amended as follows:

   a. The following is added to subsection 1, the definition of **Claim**:

   Claim also means:

   f) a civil proceeding against **Directors and Officers** before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, commenced by the filing of a notice of charges, investigative order or similar document.

   **Claim** does not include a labor or grievance proceeding which is pursuant to a collective bargaining agreement.

   b. Solely with respect to coverage provided pursuant to this endorsement, subsection 9, the definition of **Wrongful Act** is deleted in its entirety and replaced with the following:

   9. Wrongful Act means any actual or alleged:
      1. wrongful dismissal or discharge or termination of employment, whether actual or constructive;
      2. employment-related misrepresentation;
      3. violation of any federal, state or local laws (whether common law or statutory) concerning employment or discrimination in employment;
      4. sexual harassment or other unlawful workplace harassment;
      5. wrongful deprivation of a career opportunity or failure to employ or promote;
      6. wrongful discipline of employees;
      7. retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity;
      8. negligent evaluation of employees;
      9. failure to adopt adequate workplace or employment policies and procedures;
      10. employment-related libel, slander, defamation or invasion of privacy; or
      11. employment-related wrongful infliction of emotional distress.

2. Section C, Exclusions, is amended as follows:

   a. The following is added to subsection 2, Exclusions Applicable Only to Insuring Clause A3:

   c) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment –related matters brought by or on behalf of or on the right of an applicant for employment with the **Company** or any of the **Directors and Officers**, including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Company**.

SL-15319

Page 1 of 2

b. Subsection 1m is deleted in its entirety.

c. Solely with respect to coverage provided pursuant to this endorsement, Section C, Exclusions, is amended by deleting exclusion a) from subsection 1, Exclusions Applicable to all Insuring Clauses, and inserting the following:

  a) for actual or alleged bodily injury, sickness, disease, death, assault, battery or damage to or destruction of tangible property, including loss of use thereof, whether or not such property is physically injured.

d. The following is added to subsection 1, Exclusions Applicable to all Insuring Clauses, exclusion e):

  (v) brought by one or more of the **Directors and Officers** for any employment or employment-related matters.

3. Solely with respect to coverage provided pursuant to this endorsement, Section F, Settlement and Defense, is amended by deleting subsection 2.


All other terms and conditions of this **Policy** remain unchanged.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>Aurora Lighting, Inc. | | | Endorsement Number<br>2 |
|---|---|---|---|
| Policy Symbol<br>BMI | Policy Number<br>20025651 | Policy Period<br>September 25, 2005 to September 25, 2006 | Effective<br>September 25, 2005 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

### PROFESSIONAL SERVICES EXCLUSION-SECURITIES HOLDER EXCEPTION

It is agreed that Section C, Exclusions, of the Directors & Officers and Company Coverage Section is amended by adding the following to subsection 1:

p. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failing to render professional services. Provided, however, this exclusion shall not apply to any Claim(s) brought by a securities holder of the Company in the form of a securities holder class, individual or derivative action alleging failure to supervise those who performed or failed to perform such professional services, provided that such securities holder action is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, active participation of, or intervention of the Company and/or any Insureds.

All other terms and conditions of this Policy remain unchanged.

SL-15324

 

### POLICYHOLDER DISCLOSURE
### NOTICE OF TERRORISM
### INSURANCE COVERAGE

You should be aware that under the Terrorism Risk Insurance Act of 2002 ("The Act") effective November 26, 2002, any losses caused by certified acts of terrorism under your existing coverage may be partially reimbursed by the United States under a formula established by federal law (applicability is subject to the terms and conditions of each individual policy). The Act was specifically designed to address the ability of businesses and individuals to obtain property and casualty insurance for terrorism and to protect consumers by addressing market disruptions and ensure the continued availability of terrorism coverage.

Under the terms of The Act, you may now have the right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Responsibility for Compensation under The Act is shared between insurance companies covered by The Act and the United States. Under the formula set forth in The Act, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible, which is paid by the insurance company providing the coverage.

We are providing you with the terrorism coverage required by The Act. We have not established a separate price for this coverage; however the portion of your annual premium that is reasonably attributable to such coverage is equal to the amount derived by multiplying 1% of the total premium for the coverage purchased.

Name of Insured: Aurora Lighting, Inc.

Policy No. BMI20025651

Terrorism Risk Insurance Act premium: $90.37

TRIA

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

IL P 001 01 04

© ISO Properties, Inc. 2004

Page 1 of 1

LAW OFFICES OF RUSSELL L. EGLI

Russell L. Egli, Esq.
2575 Willow Point Way, Suite 111
Knoxville, TN 37931
(865) 531-8192
Fax: (865) 357-9113
E-mail: legalaction30@aim.com

October 16, 2008

Jay W. Mader, Esq. *by e-mail*
Andrew Tillman, Esq. *by e-mail*
Gary Prince, Esq. *by e-mail*
Greg Grisham, Esq. *by e-mail*
Brad Fraser, Esq. *by e-mail*

      Re:    Elder v. Girdlestone
                Knox County Circuit Court

Dear Counsel:

      I am writing concerning Mr. Prince's request that we attempt a mediation in this matter.

      Mr. Girdlestone is certainly willing to attempt a mediated resolution of this matter. It is obvious, however, that no such resolution can occur without resolving the issues arising in Mr. Girdlestone's cross-complaint as well. Indeed, because Mr. Girdlestone intends to move forward with his claims irrespective of the resolution of those at issue in the *Elder v. Girdlestone* matter and because of the intricate relationship of the factual questions at issue in those two actions, there would be little point in mediating if no attempt at a global resolution is made. As Mr. Girdlestone is presently contemplating claims for malicious prosecution against Ms. Elder and Mr. Prince, and because he further intends to litigate the various claims at issue in the cross-complaint regardless of the disposition of Ms. Elder's lawsuit, it plainly would be in the best interest of all parties to move forward with an attempted global resolution of the issues.

      Provided such a global mediation is agreed to, Mr. Girdlestone will make himself available on October 24, 2008 for that mediation.

      Thank you for your attention to this matter.

                          EXHIBIT B

Nothing in this communication shall be deemed to waive any of Mr. Girdlestone's rights or remedies, all of which are expressly reserved.

Very truly yours,

/s/ *Russell L. Egli*
/s/ *Tanya Acker*

Russell L. Egli
Tanya Acker
Counsel to Tom Girdlestone

Cc:     Tom Girdlestone
        Joanne Rodriguez, Esq.

## ∗∗ Transmit Confirmation Report ∗∗

| Name/Fax No. | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 12124533647 | Normal | 24,04:17pm | 0'31" | 3 | # O K | |

# *FAX TRANSMITTAL*

---

**FRANTZ, McCONNELL & SEYMOUR, LLP**
Suite 500, 550 W. Main Avenue
P. O. Box 39
Knoxville, TN 37901
(865) 546-9321 - phone
(865) 637-5249 – fax

---

TO:               Joanne

FAX NO.:          1-212-453-3647

FROM:             Brad Fraser

DATE:             October 24, 2008          Time: _____

RE:               Susan Elder vs. Tom Girdlestone

The pages comprising this facsimile transmission contain confidential information from the sender. This information is intended solely for the use by the individual or entity named as the recipient hereof. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this transmission is prohibited. If you have received this transmission in error, please call us collect by telephone immediately so that we may arrange to retrieve this transmission at no cost to you.

MESSAGE:    Please review and return fax to (865) 541-4617 with approval and/or changes.

If you do not receive 3 page(s), including cover sheet, please contact our receptionist or Melanie A. Edmonds at 865-546-9321.

                                                      EXHIBIT C

# *FAX TRANSMITTAL*

**FRANTZ, McCONNELL & SEYMOUR, LLP**
Suite 500, 550 W. Main Avenue
P. O. Box 39
Knoxville, TN 37901
(865) 546-9321 - phone
(865) 637-5249 – fax

TO:          Joanne

FAX NO.:     1-212-453-3647

FROM:        Brad Fraser

DATE:        October 24, 2008     Time: _____

RE:          Susan Elder vs. Tom Girdlestone

The pages comprising this facsimile transmission contain confidential information from the sender. This information is intended solely for the use by the individual or entity named as the recipient hereof. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this transmission is prohibited. If you have received this transmission in error, please call us collect by telephone immediately so that we may arrange to retrieve this transmission at no cost to you.

MESSAGE:    Please review and return fax to (865) 541-4617 with approval and/or changes.


If you do not receive 3 page(s), including cover sheet, please contact our receptionist or Melanie A. Edmonds at 865-546-9321.

## ACKNOWLEDGEMENT OF INSURER'S RIGHT TO SETTLE CLAIM

The undersigned, Tom Girdlestone ("Girdlestone"), acknowledges that he is an insured under a policy of liability insurance issued by ACE Westchester Specialty Group ("ACE") for claims made against him in his capacity as CEO with Aurora Lighting. A legal claim has been asserted against Girdlestone in that civil proceeding entitled *Susan Elder vs. Tom Girdlestone,* being case number 3-385-06 in the Circuit Court for Knox County, Tennessee ("the Elder claim"). ACE has provided defense coverage to Girdlestone in that proceeding.

Girdlestone and ACE have attended a voluntary mediation pertaining to the Elder claim with Girdlestone seeking a global resolution of the Elder claim and the claims Girdlestone may have against Elder and other third parties that have not presently been filed. Girdlestone has insisted that there be no resolution of the Elder claim without full and final resolution of all claims he may have against these other third parties. These claims also involve potential defendants that are insureds under the same policy of insurance issued by ACE.

In the context of the mediation, ACE has demanded that Girdlestone participate in the mediation and that he must cooperate in the resolution of the Elder claim, to the extent that claim can be resolved within the monetary limits set forth in the applicable policy.

Girdlestone does not believe that the Elder claim against him is valid or meritorious, and would not on his own accord consent to any separate settlement of that claim. However, given ACE's contentions regarding the duty to cooperate as set forth in the applicable policy, Girdlestone acknowledges that he will not interfere with settlement of the Elder claim within the monetary limits set forth in the ACE policy. Girdlestone consents to such settlement of that claim only because of ACE's contentions regarding the duty to cooperate as set forth in the applicable policy, and the potential that his refusal to cooperate might implicate defense coverage presently being afforded to him.

The undersigned representative of ACE acknowledges its understanding that Girdlestone has objected to settlement of the Elder claim, without there also being a full and final resolution of any claims Girdlestone may have against other third parties, including officers, directors, shareholders and employees of Aurora Lighting. ACE also acknowledges its understanding that Girdlestone is consenting to settlement of the Elder claim only because ACE has contended that he is under a contractual duty to cooperate under the liability insurance policy issued to him by ACE.

Girdlestone agrees that counsel assigned by ACE to defend him in the claims filed against him by Elder shall be authorized to engage in settlement negotiations with regard to the Elder claim.

Nothing in this Acknowledgement shall be construed to waive any claims Mr. Girdlestone may have against ACE.

Tom Girdlestone

ACE Westchester Specialty Group


BY:_____

Its:_____

S:\WDOX\CLIENTS\2072\0094730\MEMOS\00426440.DOC

2

## SUMMARY OF SETTLEMENT TERMS

**CLAIM:**    Susan Elder vs. Tom Girdlestone; Knox County, Tennessee Circuit Court
No.: 3-385-06

The above named parties have as of the date below agreed to settle all claims each of
them may have against the other as of the date of this agreement, including all claims
made in the above referenced litigation based on the following material terms:

1. Girdlestone's insurance carrier shall pay to Elder and her legal counsel the sum of
   $ *85,000.00* .

2. Elder agrees to dismiss the above civil action, with prejudice upon receipt of the
   sum referenced above.

3. The parties will execute a more comprehensive mutual release and settlement
   agreement that shall specifically include a confidentiality clause and Elder's
   agreement not to oppose any motion by Girdlestone to seal the court record in this
   action. The release shall include Girdlestone's release of any and all claims
   against Gary Prince and O'Neil, Parker & Williamson.

4. The Order of Compromise and Dismissal shall state that the clerk's costs are
   taxed to the Defendant. The parties shall bear their own discretionary costs and
   attorney's fees. The fees of the mediator shall be prorated to each of the parties.

Gary Michael Prince, Esq.
**O'NEIL, PARKER & WILLIAMSON**
416 Cumberland Avenue, S.W.
P.O. Box 217
Knoxville, TN 37901-0217
865-546-7190

J. Gregory Grisham, Esq.
**LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC**
254 Court Ave 2nd Fl
Memphis, TN 38103
Phone: 901-527-0214
S:\WDOX\CLIENTS\2072\0094730\MEMOS\00426528.DOC